The UNIVERSITY OF HOUSTON,
Appellant,

v.

Stephen BARTH, Appellee.

No. 01–06–00490–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

July 3, 2008.

Rehearing Overruled Oct. 13, 2008.

Shelley Alisa Dahlberg, Asst. Atty. Gen., Austin, for Appellant.

J.W. Beverly, Dow Golub Berg & Beverly, LLP, Houston, for Appellee.

Panel consists of Justices NUCHIA, ALCALA, and HIGLEY.

## OPINION

LAURA CARTER HIGLEY, Justice.

The University of Houston ("the University") appeals a judgment rendered pursuant to a jury's verdict finding that the University violated the Texas Whistleblower Act [1] ("the whistleblower act") by retaliating against Stephen Barth, a tenured professor at the University's Conrad N. Hilton College of Hotel Management, after he reported to university officials that the college's dean had violated the law. Barth was awarded actual damages and attorney's fees against the University based on its violation of the whistleblower act.

Of the six issues raised by the University, the dispositive issues that we address are (1) whether the trial court lacked jurisdiction over Barth's claims because he did not timely initiate the University's grievance procedure; (2) whether legally-sufficient evidence supports a finding that Barth reported a violation of the law to the appropriate law enforcement authorities; (3) whether legally-sufficient evidence supports a finding that Barth reported a violation of the law in good faith; and (4) whether legally sufficient evidence supports the jury's finding that Barth's report of a violation of the law caused the University to take an adverse employment action against him.

We reverse and remand.

### Factual & Procedural Background

In February or early March 1999, Barth reported to the University's chief financial officer and to its general counsel that the dean of the University's Conrad N. Hilton College of Hotel Management ("Hilton College"), Alan Stutts, had engaged in questionable accounting practices, mishandled university funds, and entered into an unauthorized contract for services on behalf of the college. In May 1999, Barth also reported Stutts's conduct to the University's internal auditor.

As dean of Hilton College, Stutts was Barth's supervisor. On June 17, 1999, Stutts completed Barth's annual evaluation for the 1998–1999 academic year ("the 1999 evaluation"). In the evaluation, Stutts gave Barth a "marginal" rating with respect to "grantsmanship," which pertained to Barth's success in obtaining outside grants for the college. The marginal rating adversely affected the merit raise received by Barth.

Also in 1999, Barth was denied funds for travel related to his position. In addition, after Barth reported Stutts's conduct, Stutts withdrew his participation in a symposium created by Barth from which Barth received $10,000 in annual compensation. After Stutts stopped participating, one of the symposium's sponsors withdrew its support in December 1999, and the 2000 symposium was cancelled.

On March 10, 2000, Barth filed a grievance with the University's grievance committee. In the grievance, Barth asserted, "Dean Stutts has retaliated against me for making the university administration aware of inappropriate and/or illegal administrative actions by his administration." The following were among the "retaliatory actions taken by Dean Stutts" cited by Barth: (1) "denial of travel dollars"; (2) "arbitrary and capricious evaluation (disparately imparting [sic] me by denying at least $600–$1,000 increase in salary)"; and (3) "withdrawing support for my initiatives including the Hospitality Legal Symposium, causing its cancellation and a loss of reputation in the industry."

On August 17, 2000, Barth filed a second grievance asserting that Stutts had again

1. See Tex. Gov't Code Ann. §§ 554.001–.010 (Vernon 2004).

retaliated against him by giving Barth a lower-than-deserved merit evaluation for the 1999–2000 academic year ("the 2000 evaluation"), which adversely affected his salary increase for the year 2001.

Barth's grievances were not successfully resolved through the University's grievance process. Soon after, Barth filed suit against the University alleging that it had retaliated against him for reporting Stutts's conduct. Barth asserted that such retaliation was a violation of the whistleblower act.

The University filed a plea to the jurisdiction seeking dismissal of Barth's suit. The University asserted, inter alia, that Barth had not timely initiated the grievance process, as required by the whistleblower act, thereby depriving the trial court of subject-matter jurisdiction.

The trial court denied the University's plea to the jurisdiction. We affirmed the denial in *University of Houston v. Barth*, 178 S.W.3d 157 (Tex.App.-Houston [1st Dist.] 2005, no pet.). Recognizing that the "continuing-violation doctrine" has been applied in Texas whistleblower cases, we concluded, "There are sufficient factual allegations in Barth's pleadings that could invoke the continuing-violation doctrine; whether that doctrine applies and which acts triggered the 90–day limitations period are issues that should be resolved by the trier of fact." *Id.* at 163 (citing *Univ. of Tex.-Pan Am. v. De Los Santos*, 997 S.W.2d 817, 820 (Tex.App.-Corpus Christi 1999, no pet.)).

The case was ultimately tried to a jury, but the jury was not asked to make fact-findings pertaining to whether Barth timely filed his grievances. The jury did find that the University had violated the whistleblower act and that Barth was entitled to actual damages totaling $40,000 and $245,000 in attorney's fees. The trial court rendered judgment on the jury's findings.

Presenting six issues for review, the University appeals the judgment.

## Jurisdictional Issue: Timeliness of Grievances

In its second issue, the University contends that the trial court lacked subject-matter jurisdiction over Barth's claims because he did not timely initiate the University's internal grievance procedure.

### *Whistleblower Act Provisions*

The whistleblower act provides, "A state or local governmental entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." TEX. GOV'T CODE ANN. § 554.002(a) (Vernon 2004). The act requires that, before filing suit, an employee must initiate his employer's grievance procedure not later than the 90th day after the date on which the alleged violation occurred or was discovered by the employee through reasonable diligence. *Id.* § 554.006(b) (Vernon 2004). If the employee does not timely initiate the grievance procedure, then his claims are jurisdictionally barred. *Tex. S. Univ. v. Carter*, 84 S.W.3d 787, 792 (Tex.App.-Houston [1st Dist.] 2002, no pet.); *see* TEX. GOV'T CODE ANN. § 311.034 (Vernon Supp.2007) (providing, as amended in 2005, that "[s]tatutory prerequisites to a suit, including the provision of notice, are jurisdictional requirements in all suits against a governmental entity").

### *Deemed Findings*

As mentioned, we concluded in the earlier interlocutory appeal that, given Barth's allegations, whether Barth timely initiated the grievance process was a ques-

tion of fact to be determined by the fact finder. *Barth*, 178 S.W.3d at 163. Nevertheless, the jury was not asked to make fact findings regarding the timeliness of Barth's grievances.

■ Barth contends that we must deem as found a finding in support of the judgment that Barth timely filed his grievances. Generally, when a ground of recovery consists of multiple issues, and the jury charge omits issues that constitute only a part of that ground, while other issues necessarily referable to that ground are submitted and found, the omitted elements are deemed found in support of the judgment if no objection is made, and they are supported by some evidence. Tex.R. Civ. P. 279; *Ramos v. Frito–Lay, Inc.*, 784 S.W.2d 667, 668 (Tex.1990). Statutory notice requirements can be the subject of a deemed finding. *U.S. Tire–Tech, Inc. v. Boeran, B.V.*, 110 S.W.3d 194, 200 (Tex. App.-Houston [1st Dist.] 2003, pet. denied); *see Tex. Tech Univ. Health Sciences Ctr. v. Apodaca*, 876 S.W.2d 402, 410–412 (Tex.App.-El Paso 1994, writ denied) (deeming as found finding that actual notice had been given under Texas Tort Claims Act after court concluded that notice provision was not separate ground of recovery "but was a component of the ultimate issue of the claimant's right of recovery"); *U.S. Fire Ins. Co. v. Ramos*, 863 S.W.2d 534, 537–38 (Tex.App.-El Paso 1993, writ denied) (holding that statutory notice requirement of worker's compensation statute was not independent ground of recovery; thus, notice element could be subject of deemed finding).

Here, the jury made positive liability findings against the University on Barth's whistleblower claim. The University did not object to the lack of submission of the issue regarding the timeliness of Barth's grievances. If supported by some evidence, we must deem as found findings supporting the conclusion that Barth timely filed his March 10, 2000 and his August 17, 2000 grievances. *See Ramos*, 784 S.W.2d at 668. That is, we review the record to determine whether there is legally sufficient evidence to support the deemed findings. *See In retrograde extrapolation In re J.F.C.*, 96 S.W.3d 256, 276 (Tex.2002).

■ In deciding a legal sufficiency challenge, we determine whether there is evidence that would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). To make this determination, we (1) credit all favorable evidence that reasonable jurors could believe; (2) disregard all contrary evidence, except that which they could not ignore; (3) view the evidence in the light most favorable to the verdict; and (4) indulge every reasonable inference that would support the verdict. *Id.* at 822, 827. But, we may not disregard evidence that allows only one inference. *Id.* at 822.

### The March 10, 2000 Grievance

At trial, Barth alleged, in part, that the University retaliated against him for reporting Stutts's conduct by engaging in the following "adverse employment actions" against him: (1) giving Barth a marginal rating for grantsmanship in his 1999 evaluation, (2) denying Barth travel expenses, and (3) withdrawing support for Barth's legal symposium.[2] Barth initiated the grievance process with regard to these adverse employment actions by filing a grievance on March 10, 2000. For the grievance to have been timely filed, the evidence must support a finding that

---

2. The jury did not award damages for Barth's claim of denied travel expenses. On appeal, the parties do not focus on that claimed adverse employment action.

Barth's March 10 grievance was filed within 90 days of when Barth discovered the whistleblower violation through reasonable diligence. *See* TEX. GOV'T CODE ANN. § 554.006. In other words, the record must contain some evidence that Barth did not discover the violation through reasonable diligence until after December 10, 1999.

Here, the record shows that Barth received a copy of his 1999 evaluation on June 10, 1999. On June 15, 1999, Barth sent a letter to Stutts questioning the evaluation and requesting that Stutts reconsider "several components," including grantsmanship.

The evidence presented also shows that Stutts refused to honor an agreement with Barth in which Stutts had agreed that Barth would receive extra compensation for sitting on the academic council. Barth stated, in a June 19, 1999 meeting with the University's provost, that he believed Stutts was refusing to honor the agreement in retaliation for his reports against Stutts.

On December 2, 1999, Barth sent a letter to the provost in which Barth stated, "This letter is to officially notify you of my belief that I am being retaliated against (directly and indirectly) by the administration of the Conrad N. Hilton College for challenging and/or questioning various practices and/or decisions made by the administration." In response, the provost advised Barth in a December 8, 1999 letter that "it might be appropriate" for Barth to initiate the grievance process.

The evidence also showed that, in 1999, Stutts did not participate in Barth's symposium following Barth's reports of his conduct. In addition, the evidence showed that Barth had received written notification, on December 3, 1999, from the symposium's sponsor that the sponsor was withdrawing its support for the 2000 symposium.

Barth contends that the evidence demonstrates that he was not aware that the University had retaliated against him, with respect to either the 1999 evaluation or the withdrawal of support for the symposium, until January 14, 2000. On that date, Barth obtained, through an open records request, a copy of a colleague professor's evaluation. According to Barth, the colleague's evaluation showed that Barth had been treated disparately because more stringent standards had been applied to review Barth's performance with respect to grantsmanship than to the colleague.

Barth claims that he became aware of the whistleblower violation only when he received a copy of the colleague's evaluation and realized that the colleague was being treated more favorably. Barth testified that receipt of his colleague's merit evaluation "kind of opened my eyes to just how differently I was being treated," particularly when "added to all the stuff that had gone on through the year."

Crediting all favorable evidence that reasonable jurors could believe and disregarding all contrary evidence except that which they could not ignore, we disagree with Barth that the record contains legally-sufficient evidence to show that he did not discover the adverse employment actions identified in his March 10 grievance until January 14, 2000. As mentioned, the whistleblower act provides that an employee must invoke the applicable grievance or appeal procedures not later than the 90th day after the date on which the alleged violation *was discovered by the employee through reasonable diligence.* TEX. GOV'T CODE ANN. § 554.006(b)(2). We noted in our earlier opinion in this case that, under the continuing-violation doctrine, the focus is on what event, in fairness and in logic, should have alerted the average layman to

protect his rights. *Barth,* 178 S.W.3d at 163 (citing *Glass v. Petro–Tex Chem. Corp.,* 757 F.2d 1554, 1560–61 (5th Cir. 1985)).

Here, Barth was aware of his 1999 evaluation on June 17, 1999. The record reflects that he had concerns about the accuracy of his evaluation only a few days after its receipt. The evaluation was completed by Stutts three to four months after Barth initially reported Stutts's conduct to the University's administration and within approximately one month of Barth's report to the University's auditor. The record further shows that, on June 19, 1999, Barth believed that Stutts was retaliating against him by failing to honor a compensation agreement. As evidenced by his December 2, 1999 letter, Barth continued to believe throughout the year that Stutts was retaliating against him for reporting the conduct. Although it is contrary to the implied timeliness finding, this is evidence that we cannot ignore in conducting our sufficiency review. *See Keller,* 168 S.W.3d at 829. Given this evidence, we cannot conclude in fairness and in logic that Barth was not aware of the violative conduct underlying his March 10 grievance until he received a copy of his colleague's evaluation on January 14, 2000.

Courts have recognized that discovery of a whistleblower violation is not delayed until the time an employee confirmed his belief that his employer had retaliated against him. *See Schindley v. Northeast Tex. Cmty. Coll.,* 13 S.W.3d 62, 67 (Tex. App.-Texarkana 2000, pet. denied); *Villarreal v. Williams,* 971 S.W.2d 622, 626 (Tex. App.-San Antonio 1998, no pet.). We conclude that evidence of when Barth received his colleague's evaluation is not "some evidence" that he did not discover, through reasonable diligence, the whistleblower violation until January 14, 2000.

We hold that the evidence is legally insufficient to support an implied finding that Barth timely filed his March 10, 2000 grievance.

### The August 17, 2000 Grievance

Next, we determine whether legally sufficient evidence supports an implied finding that Barth's August 17, 2000 grievance was timely filed. In that grievance, Barth complains that Stutts retaliated against him by again giving him a lower-than-deserved rating with respect to grantsmanship in Barth's 2000 evaluation.

The University contends that the evidence shows Barth knew of the 2000 evaluation, including his low grantsmanship rating, on May 8, 2000, when Barth first received a copy of the initial version of the evaluation. Barth points to evidence that he did not receive his "final" evaluation, on which he based his second grievance, until August 3, 2000. Thus, the question becomes whether legally-sufficient evidence was presented to support an implied finding that the accrual date for purposes of the second grievance was August 3, 2000.

By analogy, in employment discrimination cases, courts have determined that the limitations period for filing an administrative complaint accrues when the employee receives unequivocal notice of the adverse employment action or when a reasonable person would know of the adverse action. *See Johnson & Johnson Med., Inc. v. Sanchez,* 924 S.W.2d 925, 928 (Tex.1996); *Tex. A & M Univ., Corpus Christi v. Vanzante,* 159 S.W.3d 791, 794–96 (Tex.App.-Corpus Christi 2005, no pet.); *Tex. Parks & Wildlife Dept. v. Dearing,* 150 S.W.3d 452, 459 (Tex.App.-Austin 2004, pet. denied). Here, the record shows that, after Barth initially received the evaluation on May 8, 2000, Barth and Stutts corresponded regarding the evaluation during the summer of 2000. Stutts requested additional information from Barth related to the evalua-

tion, including information relevant to the grantsmanship rating. Ultimately, Stutts revised portions of the initial evaluation, although the grantsmanship rating, on which Barth bases his grievance, did not change. Barth did not receive the final version of the evaluation until August 3, 2000. The final, revised evaluation is the adverse employment action of which Barth complained in his August 17, 2000 grievance.

Barth presented evidence that Stutts represented to him that the initial May 8, 2000 evaluation was not the final evaluation through evidence showing that Barth was led to believe that the grantsmanship rating might change. Thus, when considered in the context of the record, the May 8 evaluation was not an unequivocal notice of his low grantsmanship rating or necessarily evidence that Barth should have known that his final evaluation would contain an unsatisfactory grantsmanship rating. To the contrary, Barth presented evidence that he received the first unequivocal notice of his low grantsmanship rating on August 3, 2000.

Applying the appropriate standard, we hold that the evidence is legally sufficient to support an implied finding that Barth timely filed his August 17, 2000 grievance. *See* TEX. GOV'T CODE ANN. § 554.006(b)(2).

### Conclusion Regarding Jurisdictional Issue

■ In sum, the evidence is legally sufficient to support a finding that Barth timely filed his August 17, 2000 grievance, but is not legally sufficient to support a finding that Barth timely filed his March 10, 2000 grievance. We hold, therefore, that (1) the trial court had subject-matter jurisdiction over the claims identified in Barth's August 17, 2000 grievance, i.e., claims based on Barth's allegation that the University retaliated against him by underrating his performance in the 2000 eval-

uation and (2) the trial court did not have subject matter jurisdiction over Barth's claims identified in his March 10, 2000 grievance, i.e., claims based on his 1999 evaluation and on Stutts's withdrawal of his support for the 2000 symposium. *See Thomas v. Long,* 207 S.W.3d 334, 338–39 (Tex.2006) ("[I]t is proper for a trial court to dismiss claims over which it does not have subject matter jurisdiction but retain claims in the same case over which it has jurisdiction.").

When reversing a trial court's judgment, we should render the judgment that the trial court should have rendered, except when a remand is necessary for further proceedings. TEX.R.APP. P. 43.3. Here, because we cannot determine precisely which actual damages and attorney's fees were awarded by the jury for which claims, it is necessary to reverse the trial court's judgment and remand the case to the trial court for further proceedings. *See id.;* TEX.R.APP. P. 44.1(b). On remand, the trial court should dismiss those claims over which it lacks jurisdiction, as discussed above, and permit Barth to pursue a new trial of those claims over which the court has jurisdiction. *See Thomas,* 207 S.W.3d at 339.

We sustain the University's second issue, in part, and deny it, in part.

### Remaining Issues

In its remaining issues, the University (1) challenges the legal and factual sufficiency of certain elements of Barth's whistleblower cause of action, (2) asserts charge error, and (3) challenges the jury's award of attorney's fees. Because we have determined that remand is the appropriate disposition, at this point, we need not consider the University's arguments relating to factual sufficiency, charge error, or attorney fee's error; a favorable disposition on these arguments would re-

sult in no greater relief for the University. *See* TEX.R.APP. P. 47.1. We consider only those remaining arguments that could result in the greater relief of rendition: namely, those arguments asserting that the evidence was legally insufficient to support the jury's whistleblower-liability finding.

### Good Faith Report of Law Violation to Appropriate Law Enforcement Authority

To succeed on his whistleblower claim, Barth was required to prove that he reported, in good faith, a violation of the law to an appropriate law enforcement authority. *See* TEX. GOV'T CODE ANN. § 554.002(a). At trial, Barth asserted three grounds to support his whistleblower claim: (1) retaliation for his report to university officials that Stutts violated the Texas Penal Code; (2) retaliation for his report to university officials that Stutts violated the University's internal rules; and (3) retaliation for his report to university officials that Stutts violated state statutes and regulations governing the administration of government contracts. The record does not reveal on which of these grounds the jury made its liability finding against the University. Thus, to prevail on appeal, the University must attack each ground. *See Britton v. Tex. Dep't of Criminal Justice*, 95 S.W.3d 676, 681 (Tex.App.-Houston [1st Dist.] 2002, no pet.).

In its first issue on appeal, the University asserts that the evidence is legally insufficient to show that Barth reported the alleged Penal Code violations to the appropriate law enforcement authorities because university officials cannot enforce or investigate Penal Code violations. In its third issue, the University asserts that the evidence is legally insufficient to show that Barth reported a violation of the law in good faith (1) because the University's internal rules are not "laws" for purposes of the whistleblower act and (2) because Barth did not report the Penal Code violation in "good faith."

On appeal, however, the University does not address the third ground on which Barth based his whistleblower claim in the trial court: Barth's claim that the University retaliated against him for reporting to University officials that Stutts violated state law regulating the administration of government contracts. More specifically, the University offers no substantive argument or authority to show that (1) state laws regulating government contract administration are not "laws" for purposes of the whistleblower act; (2) the persons to whom Barth reported Stutts's conduct were not appropriate law enforcement authorities with respect to those laws regulating government contract administration; or (3) Barth did not report a violation of those laws in good faith.[3]

---

**3.** In its statement of the issues and sub-issues, the University globally references legal insufficiency of the evidence related to certain whistleblower claim elements. These oblique references to legal insufficiency do not raise challenges to Barth's whistleblower claim premised on his report that Stutts violated the law governing the administration of state contracts. Rather, when read in context, the issues and sub-issues introduce the University's challenges to Barth's claims that he was retaliated against for reporting violations of the Penal Code and violations of the University's internal rules. Our review of the briefs indicates that the University makes no affir-

mative, substantive argument directed toward Barth's whistleblower claim based on his report of a violation of the law governing the administration of state contracts. We recognize that we must "construe the Rules of Appellate Procedure reasonably, yet liberally, so that the right to appeal is not lost by imposing requirements not absolutely necessary to effect the purpose of a rule." *Republic Underwriters Ins. Co. v. Mex–Tex, Inc.*, 150 S.W.3d 423, 427 (Tex.2004); *see* TEX.R.APP. P. 38.9. And we are cognizant that the statement of an issue should be treated as covering every subsidiary issue. TEX.R.APP. P. 38.1(e). Nevertheless, "we know of no au-

■ An appellant must attack all independent bases or grounds that fully support the trial court's complained-of ruling or judgment. *Britton*, 95 S.W.3d at 681. If no error is assigned to an independent ground that could, if meritorious, fully support the complained-of ruling or judgment, then we must accept the validity of the unchallenged, independent ground. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993); *Britton*, 95 S.W.3d at 681. Concomitantly, when a separate and independent ground that supports a judgment is not challenged on appeal, the appellate court must affirm the lower court's judgment. *Britton*, 95 S.W.3d at 681.

Here, the University has not challenged a distinct ground of recovery asserted by Barth in the trial court to support the jury's whistleblower liability finding, namely, Barth's claim that the University retaliated against him for reporting to University officials that Stutts violated state law governing the administration of government contracts. Because the University has not challenged a ground asserted by Barth in the trial court on which whistleblower liability may have been based, we must affirm the judgment on this unchallenged ground. *See id.*

thority obligating us to become advocates for a particular litigant through performing their research and developing their argument for them." *Tello v. Bank One, N.A.*, 218 S.W.3d 109, 116 (Tex.App.-Houston [14th Dist.] 2007, no pet.) (citing *Jordan v. Jefferson County*, 153 S.W.3d 670, 676 (Tex.App.-Amarillo 2004, pet. denied)). If we were to construe the University's briefing as challenging the legal sufficiency of the evidence to support the jury's liability finding based on Barth's claim that the University retaliated against him for reporting Stutts's violation of the laws governing the administration of government contracts, we would improperly become an advocate for the University. *See id.* This we cannot do.

4. The University specifically attacks the jury's answer to the third question. The University

We overrule the University's legal-sufficiency challenges presented in its first and third issues.

### Barth's Reports Caused An Adverse Employment Action

The second question of the charge asked the jury, "Did The University of Houston take adverse personnel actions(s) against Stephen Barth in retaliation for his reports of a violation of law to an appropriate law enforcement authority?" The jury responded, "Yes." The third question asked the jury, "Do you find that The University of Houston would have taken the adverse personnel actions(s) it took against Stephen Barth based solely on information, observation, or evidence that is not related to Stephen Barth's report(s) of violation(s) of law?" The jury again responded affirmatively.

In its fourth issue, the University raises what we construe to be a challenge to the legal sufficiency of the evidence supporting a finding that Barth's reports of law violations caused the University to retaliate against Barth by giving him a marginal rating for grantsmanship in the 2000 evaluation.[4]

asserts that the evidence established, as a matter of law, that it would have taken the action it did against Barth based solely on information, observation, or evidence that is not related to Barth's report of law violations. In this regard, the whistleblower act provides,

> It is an affirmative defense to a suit under this chapter that the employing state or local governmental entity would have taken the action against the employee that forms the basis of the suit based solely on information, observation, or evidence that is not related to the fact that the employee made a report protected under this chapter of a violation of law.

Tex. Gov't Code Ann. § 554.004(b) (Vernon 2004). We recognized, in *City of Houston v. Levingston*, that although statutorily labeled as an "affirmative defense," proof under this section actually negates the cau-

■ A public employee suing under the whistleblower act must prove that he suffered discriminatory or retaliatory conduct by the employer that would not have occurred when it did if the employee had not reported a law violation. *City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 67 (Tex. 2000); *Tex. Dep't of Human Servs. v. Hinds,* 904 S.W.2d 629, 633 (Tex.1995). That is, the employee must establish a "but for" causal connection between the reported law violation and the employer's actions. *City of Forth Worth v. Johnson,* 105 S.W.3d 154, 163 (Tex.App.-Waco 2003, no pet.). The employee need not establish that the reported violation of law was the *sole* cause of the employer's action. *Hinds,* 904 S.W.2d at 635.

■ In a whistleblower claim, "[c]ircumstantial evidence may be sufficient to establish a causal link between the adverse employment action and the reporting of illegal conduct." *Zimlich,* 29 S.W.3d at 69. Such evidence includes discriminatory treatment in comparison to similarly-situated employees. *Id.* Evidence that only one similarly-situated employee was treated differently from the plaintiff can be legally sufficient circumstantial evidence to show causation. *See Johnson,* 105 S.W.3d at 168.

■ In this case, Barth argued that Stutts evaluated another professor, a similarly-situated employee, using more favorable standards with respect to grantsmanship. The University contends that the other professor was not a similarly-situated employee. It points to evidence showing that the other professor had distinct qualifications, experience, and accomplishments, which support a higher rating.

At trial, Barth offered the other professor's evaluation, which appears to show a more relaxed standard with respect to grantsmanship than the standard applied to Barth in his evaluation. Barth also relied on the findings and recommendations of the University's grievance committee, which evaluated Barth's grievances. The evidence shows that the committee considered the other professor to be a similarly-situated employee. The University's grievance committee also agreed that Barth had been treated disparately with respect to his 2000 evaluation. The committee found that Barth's rating for grantsmanship "was arbitrary and unfair." [5] The grievance committee's report specifies and compares the standards used to rate Barth in the area of grantsmanship with those used to rate the other professor. The committee concluded that disparate standards had been applied to the two similarly-situated employees, resulting in a lower rating for Barth.

The University also points to evidence indicating that Barth had received "marginal" ratings in his evaluations in previous years. Barth acknowledges that his low ratings in grantsmanship in earlier years may have been justified, but contends that the evidence demonstrates that he successfully obtained grants for the symposium during the time period included in the 2000 evaluation.

sation element of a plaintiff's whistleblower case. 221 S.W.3d 204, 238 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (citing *Harris County v. Vernagallo,* 181 S.W.3d 17, 23 n. 12 (Tex.App.-Houston [14th Dist.] 2005, pet. denied)). Thus, the actual inquiry here is whether legally sufficient evidence supports the jury's finding regarding causation, i.e., that Stutts retaliated against Barth because he reported his conduct.

**5.** As permitted by university procedure, the provost decided not to follow the grievance committee's recommendations to the extent that they were favorable to Barth and denied Barth any relief on his grievances.

The University also asserts that Barth did not deserve a better rating in grantsmanship because the symposium, which was the source of the grants which Barth brought to Hilton College, had lost money each year it was held. Barth contends that the profitability of the symposium was not a factor in the evaluation. Barth testified that he was only required to obtain funding for the project, which he did.

In sum, Barth presented evidence disputing the reasons proffered by the University for his low grantsmanship rating in 2000; the jury was free to disbelieve the University's explanation in this case. Viewing the evidence as required, we conclude that the evidence supports a finding that Barth's reports of Stutts's actions was "a cause" of Barth receiving a marginal rating with respect to grantsmanship in the 2000 evaluation. The record thus contains legally sufficient evidence to support a causation finding.

We overrule the University's legal-sufficiency challenge presented in its fourth issue.

### Conclusion

We reverse the judgment of the trial court and remand for further proceedings.

Justice ALCALA, dissenting.

ELSA ALCALA, Justice, dissenting.

I respectfully dissent. I disagree with the majority opinion's determination that the University waives its legal sufficiency challenge due to inadequate briefing. By addressing each of the arguments presented by the parties, I would hold that the evidence is legally insufficient to show that Stephen Barth, in good faith, reported a violation of the law to an appropriate law enforcement authority, as those terms are defined by the Texas Whistleblower Act ("the Act"). *See* TEX. GOV'T CODE ANN.

§§ 554.001–.010 (Vernon 2004). The people to whom Barth reported the conduct by Alan Stutts do not meet the definition of an appropriate law enforcement authority under the Act. Also, Barth, an attorney with experience in the requirements of the Act, cannot objectively show he had a good faith belief the people to whom he reported the conduct were appropriate law enforcement authorities. Further, Barth's report to the police came after the alleged retaliatory acts and, therefore, Barth cannot, as a matter of law, show that the retaliatory acts were caused by the report to the police. I would therefore reverse and render judgment in favor of the University of Houston ("the University").

### Waiver of Appeal

I respectfully disagree with the majority opinion's determination that the challenge to the legal sufficiency of the evidence is waived due to inadequate briefing. According to the majority opinion, "the University makes no argument directed toward Barth's claim that his whistleblower claim is based on his report of a violation of the law governing state contracts." The majority opinion errs in finding waiver because it finds waiver (A) based on the University's failure to present Barth's theory for him; (B) based on the faulty premise that "the University makes no argument" about the law governing state contracts; (C) despite no complaint of inadequate briefing; and (D) despite the clear challenge to the elements of the claim. These reasons are detailed more specifically below.

### A. Waiver Based on Failure to Present Barth's Theory for Him

The majority opinion finds waiver based on the University's failure to present Barth's theory for him. It is apparent that the University did not present Barth's theory for him because that theory is im-

material to the University's no-evidence challenge. The University's issue number one inquires, "Is there legally and factually sufficient evidence to support the jury's finding that Barth's report was causally linked to the alleged adverse actions taken against him?" The subpart of this issue asks, "Were the individuals to whom Barth reported the alleged policy and/or legal violations appropriate law enforcement officials under the Texas Whistleblower Act?" In its opening brief, the University states its theory as follows:

> The report must have been made to an appropriate law enforcement official. Although Barth reported alleged violations of internal University policy to several University officials, his only report to an appropriate law enforcement official was his report to the University of Houston Police Department. The alleged adverse actions for which Barth sought judicial relief all occurred *before* his report to the UH Police Department. Accordingly, Barth failed to demonstrate that but for his report, the purported adverse employment actions would not have occurred when they did.

The University explains that Randy Harris, Don Guyton, and Dennis Duffy are not appropriate law enforcement officials under the Act because the only law to be enforced was the Penal Code, and the people to whom Barth reported could not enforce that law. With respect to Guyton's audit team, the University contends,

> Only when an audit uncovers evidence of suspected criminal activity does the audit team turn the case over to UH police and may cooperate with any police investigation. . . . None of the individuals to whom Barth made the reports were responsible for investigating or enforcing the law in question. . . . Instead, they were only charged with cooperating

with the Police Department's investigation.

The elements of a claim under the Act that an employee must prove are that: (1) he is a public employee; (2) he acted in good faith in making his report; (3) the report involved a violation of law; (4) the report was made to an appropriate law enforcement authority; and (5) he suffered retaliation as a result of making the report. *State v. Lueck*, 212 S.W.3d 630, 637 n. 3 (Tex.App.-Austin 2006, pet. filed). In its legal sufficiency issues, the University plainly challenges the second element, which requires that the employee act in good faith in making the report; the fourth element, which requires that the report be made to an "appropriate law enforcement authority"; and the fifth element, which requires proof of causation, in that the employee must show that he suffered retaliation as a result of making the report.

If the University's arguments and authorities in the opening brief are correct— that the only law violated was the Penal Code, that the people to whom Barth reported were not appropriate law enforcement officials, that the report to the University police came too late, and that Barth did not have a good faith belief that the people to whom he reported were appropriate law enforcement officials—then the University must prevail in its challenge to the legal sufficiency of the evidence. This is because the University has shown that there is no evidence of the required elements that the report must be made to an appropriate law enforcement authority or to someone whom Barth believed, in good faith, to be an appropriate law enforcement authority, and that he suffered retaliation as a result of making the report. *See id.* Thus, the legal sufficiency challenge is adequate for the University to

prove that there is no evidence of the required elements of the cause of action.

Barth attempts to respond to the University's claims by briefly presenting an alternate argument concerning what the majority opinion calls "the law governing state contracts." In its entirety, the sole argument by Barth concerning civil law is:

> In addition, Guyton's position as Internal Auditor is established under Chapter 2102 of the Texas Government Code.... Pursuant to TEX. GOV'T CODE §§ 2102.007 and 2102.003, Guyton is authorized to conduct audits including an "investigation described by Section 321.0136." TEX. GOV'T CODE § 321.0136 defines investigation as "an inquiry into specified acts or allegations of impropriety, malfeasance, or nonfeasance in the obligation, expenditure, receipt, or use of state funds, or into specified financial transactions or practices that may involve such impropriety, malfeasance, or nonfeasance." Malfeasance is defined as "a wrongful or unlawful act; esp. wrongdoing or misconduct by a public official." BLACK'S LAW DICTIONARY 976 (8th Ed.). A reasonable interpretation of the scope of Guyton's statutory duty is that he is authorized to investigate violations of criminal and civil law involving impropriety or malfeasance in the use of state funds.

The Act provides that "a report is made to an appropriate law enforcement authority if the authority is a part of a state or local governmental entity or of the federal government that the employee in good faith believes is authorized to: (1) regulate under or enforce the law alleged to be violated in the report; or (2) investigate or prosecute a violation of criminal law." TEX. GOV'T CODE ANN. § 554.002(b); *see Tex. Dep't of Transp. v. Needham,* 82 S.W.3d 314, 317–18 (Tex.2002). A close examination of Barth's argument reveals

that Barth makes no claim concerning the first alternative. More specifically, Barth makes no argument that Guyton or Harris were authorized to "regulate under or enforce" either the rules that apply to the University system or civil regulations over state contracts. *See* TEX. GOV'T CODE ANN. § 554.002(b). Barth's argument focuses on the second alternative, which requires evidence that the person have been authorized to "investigate or prosecute a violation of criminal law." *See Needham,* 82 S.W.3d at 317–18. By referring to Guyton's authority to investigate civil and criminal law, Barth misinterprets the second alternative, which applies only to investigation or prosecution of a violation of *criminal* law. *See id.* The University's entire opening brief repeatedly expresses its position that no person or entity, other than the University Police, could "investigate or prosecute a violation of criminal law." *See id.* Because the only dispute concerns whether the people to whom Barth reported could investigate or prosecute a violation of *criminal* law, the University did not waive any argument concerning regulation or enforcement of a *civil* law.

The University's legal sufficiency challenge was sufficient to attack the elements of the claim, and Barth responded to that challenge with his theory of the evidence. Nothing in the Rules of Appellate Procedure requires that the appellant present the appellee's arguments for the appellee. Thus, the majority opinion errs by finding waiver based on the University's failure to present Barth's theory for him.

**B. Waiver Based on Faulty Premise**

The majority opinion finds waiver based on the faulty premise that "the University makes no argument" about the laws governing state contracts. This claim is erroneous because the University does respond to Barth's arguments.

Although the majority opinion finds it fatal that the University purportedly did not make an argument about laws governing state contracts, it is important to note, as shown from the quoted excerpt above, that Barth does not make any specific argument about state contracts. Barth's focus is on the investigation of violations of criminal and civil law involving impropriety or malfeasance in the use of state funds. Moreover, Barth misinterprets the second alternative by suggesting that an investigation into a violation of a *civil* rule or regulation would meet the requirements of the Act. *See id.* The Act plainly includes only the investigation or prosecution of *criminal* law. *Id.*

Until Barth presents the alternate theory about civil law, there is no reason for the University to mention state contracting laws, because that matter is irrelevant under the University's theory that only the law in the Penal Code applies to this factual situation. However, after Barth presents his theory in his appellee's brief, the University's reply brief responds to Barth's position as follows:

> Barth alternatively asserts that Harris, Guyton, and Duffy each *in their own right are appropriate law enforcement authorities under the Act.* As the Texas Supreme Court has emphasized, the particular law that the employee reported was violated is crucial to the determination of whether a report was made to an appropriate law enforcement official.... The law in question here is Penal Code § 37.10, which prohibits the knowing entry of false information in a government record. Barth ignores this part of the inquiry in his brief, instead *focusing on the generalized authority of each individual to whom he made the reports.*

(Emphasis added and citations omitted). The University, therefore, directly dis-

putes Barth's contention by arguing that nothing in Guyton's "generalized authority" would make Guyton an appropriate law enforcement authority "in [his] own right." The majority opinion therefore errs by finding waiver based on the faulty premise that Barth made an argument about laws governing state contracts and that the University did not respond to the argument presented by Barth.

### C. Waiver Despite No Complaint of Inadequate Briefing

Although a party is not required to assert waiver for an appellate court to determine that a matter is waived, it is noteworthy that Barth never contends that the University's brief is inadequate in any way or that we should find any issue waived. Barth understands the no-evidence challenge by responding with his claims concerning that challenge. The majority opinion's *sua sponte* finding of waiver is not based on any complaint of inadequate briefing.

### D. Waiver Despite Clear Challenge to Elements of Claim

The majority opinion finds waiver even though the University could prevail on its legal sufficiency challenge if it established what it complained of in its opening brief. It is undisputed that the University's brief (1) plainly asserts an issue challenging the legal sufficiency of the evidence concerning whether Barth's reports were to an appropriate law enforcement authority prior to the alleged retaliatory acts; (2) includes citations to the record, legal authority, and analysis to support the issue; (3) clearly expresses the position that the people to whom Barth reported the purported violations were not the appropriate law enforcement officials under the Act because the only applicable law is the Penal Code and none of the officials to whom he reported could investigate violations of the Penal

Code, even when considering the rules that apply to the University system; and (4) asserts Barth did not have a good faith belief that the people to whom he made the report were the appropriate ones under the Act. But this is not enough under the holding of the majority opinion. According to the majority opinion, the University must also have presented Barth's alternate position about state contracting laws and then negated that theory by doing more than affirmatively explaining why it is an incorrect theory. That is not the law that pertains to the briefing requirements, which requires that we liberally construe briefs and that the statement of an issue will be treated as covering every subsidiary question that is fairly included. *See* Tex.R.App. P. 38.1(e), 38.9.

To support its theory that the University waived error by not attacking each ground under which the jury made its liability finding, the majority opinion cites to *Britton v. Texas Department of Criminal Justice*, 95 S.W.3d 676, 681 (Tex.App.-Houston [1st Dist.] 2002, no pet.). That case holds that when a plea to the jurisdiction is on multiple grounds and a trial court sustains it without specifying the grounds, an appellant waives error by not challenging each of the alternate grounds. *Id.* In *Britton*, we explained,

> The rule that an appellant must attack all independent grounds supporting a judgment has been applied in many instances. For example, when a summary judgment motion alleges multiple grounds and the order granting summary judgment does not specify the ground on which the summary judgment was rendered, the appellant must challenge and negate all summary judgment grounds on appeal.... Similarly, an appellate court will overrule a challenge to fact findings that underpin a legal conclusion or disposition when other fact findings that support that legal conclu-

> sion or disposition go unchallenged.... The same result obtains when more than one legal conclusion independently supports a judgment or ruling, but the appellant challenges only one of those legal conclusions on appeal.... Likewise, when independent jury findings fully support a judgment, an appellant must attack each independent jury finding to obtain reversal.

*Id. Britton* is correct. *See id.*

The majority opinion misapplies both *Britton* and the underlying arguments and law in this case. *See id.* Here, the jury charge asked the jury, "Did Stephen Barth make a report of a violation of law in good faith to an appropriate law enforcement authority?" The jury charge instructed that

> "Violation of Law" refers to any violation of state or federal statute, an ordinance of a local governmental entity, or a rule adopted under a statute or ordinance. The University of Houston's rules are adopted under a statute.

There were no alternate questions that the jury could have answered to support the judgment. The jury was asked a single question concerning whether there was a report to an appropriate law enforcement authority. Thus, there was no alternate question to support the judgment, as required for there to be any waiver under *Britton*. *See id.*

The majority opinion's finding of waiver is erroneous because (1) assuming that an appellant must challenge each part of the *definition* of a term to avoid waiver, the University did that here, and (2) the law of waiver does not require that an appellant negate all theoretically possible alternative ways that are listed in a *definition* of a term.

First, assuming that, as the majority opinion holds, the appellant must challenge

each part of the *definition* of the term to avoid waiver, the University did that here. The definition of "Violation of Law" was challenged by the University in its argument that only the Penal Code was violated, which addresses the portion of the definition that states that the term "refers to any violation of state or federal statute, [or] an ordinance of a local governmental entity." The definition of "Violation of Law" was further challenged by the University in its argument that no law was violated because none of the University's rules met the definition of law in the jury charge, which defined law as "a rule adopted under a statute or ordinance." Nothing in the jury charge defined law as a state regulation. Thus, it was unnecessary for the University to mention state regulations because that was not an alternative given to the jury in the definition of "Violation of Law." The University plainly argues that the *only* law that the record shows could have been violated was the Penal Code and that none of the University rules were laws. Thus, the University challenged every theory under the definition of "Violation of Law" that was given to the jury.

Second, the law of waiver does not require that an appellant negate all theoretically possible alternative ways that are listed in a *definition* of a term. All that is required is that the appellant challenge the evidence and theories actually presented to the trial court or jury. Here, the University presented its theory that the only evidence in the record that met the definition of law was the Penal Code violations. That challenge was sufficient to preserve the University's legal-sufficiency complaint.

Unlike the examples in *Britton* that concern the failure to challenge alternate grounds that could support a judgment, here the University's argument attacks each of the elements of a claim under the Act. The majority opinion stretches the law of waiver by now saying that if a party's closing argument presents multiple alternate theories to the jury concerning a *definition* of one of the terms, to preserve error, the appellant will have to negate each of those alternate parts of the *definition* in its initial briefing, or any error will be waived, even if the appellant properly challenges each of the elements of the claim and presents its theory concerning the applicable *definition* of the term. That is not what *Britton* holds. *See id.*

In short, the majority opinion violates the briefing requirements of the Rules of Appellate Procedure. *See* Tex.R.App. P. 38.1(e), 38.9. The majority opinion accuses the dissenting opinion of "improperly becom[ing] an advocate for the University" and states, "This we cannot do." However, it is well established that an intermediate appellate court has the obligation to address the arguments of the parties, and that this is something that we *must* do.

I would hold that the legal sufficiency challenge is not waived under these circumstances, which undisputedly show that the University challenges the elements of the cause of action, cites to the record, cites to case law, presents a cogent argument, and presents a legally correct theory that could properly result in the resolution of the appeal. *See id.* Because the University's brief adequately challenges the legal sufficiency of the evidence, the majority opinion errs by refusing to address the points raised in the appeal.

### The Whistleblower Act

The Whistleblower Act prohibits a state or local governmental entity from taking adverse personnel action against "a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an

appropriate law enforcement authority." *See Needham,* 82 S.W.3d at 317 (quoting Tex. Gov't Code Ann. § 554.002(a)). We review de novo as a question of law the determination whether the reports made to the University employees were to appropriate law enforcement officials. *City of Houston v. Kallina,* 97 S.W.3d 170, 173 (Tex.App.-Houston [14th Dist.] 2002, pet. denied).

The Act provides that "a report is made to an appropriate law enforcement authority if the authority is a part of a state or local governmental entity or of the federal government that the employee in good faith believes is authorized to: (1) regulate under or enforce the law alleged to be violated in the report; or (2) investigate or prosecute a violation of criminal law." Tex. Gov't Code Ann. § 554.002(b).

### A. The Definition of Law under the Whistleblower Act

To determine whether Barth reported the conduct to the proper law enforcement authority, it is necessary to first examine what laws were violated. Under the Act, "law" means a state or federal statute, an ordinance of a local government entity, or a rule adopted under a statute or ordinance. Tex. Gov't Code Ann. § 554.001(1). An administrative rule or regulation is considered a law under the statute. *See City of San Antonio v. Heim,* 932 S.W.2d 287, 290–91 (Tex. App–Austin 1996, writ denied). However, a violation of a department's internal policy is insufficient to meet the definition of law in the Act. *Harris County Precinct Four Constable Dep't v. Grabowski,* 922 S.W.2d 954, 956 (Tex.1996). Here, there is no dispute that a violation of the Penal Code or a violation of a civil administrative rule or regulation is considered a law under the Act. The dispute is whether an administrative rule of the university or the university system is considered a law under the Act.

Rules enacted by the Board of Regents meet the definition of law under the Act. *Fazekas v. Univ. of Houston,* 565 S.W.2d 299, 304 (Tex.App.-Houston [1st Dist.] 1978, writ ref'd n.r.e.) ("Since the Board of Regents of the University of Houston is authorized by statute to enact bylaws, rules and regulations necessary to the government of the University, its rules are of the same force as would be a like enactment of the legislature.").

The University contends that no evidence shows "that the Board, pursuant to its statutory authority, actually adopted the rule or policy" and that, without that showing, the evidence is legally insufficient to show that the rule or policy was a law, as defined by the Act. The University's position is that the situation here is unlike *Fazekas,* because in *Fazekas* there was evidence before the court that the University's Board of Regents had revised the policy at issue in that case, but here, no evidence shows the Board enacted the rule. *Id.* Barth responds that all the University's rules are enacted under the Board of Regent's statutory authority. Barth contends that the Board of Regents instituted its policies through the University's System Administrative Memorandum, commonly referred to as the SAM, and the University's internal Manual of Administrative Policies and Procedures, commonly referred to as the MAPP. I address the SAM and the MAPP separately.

### 1. The SAM

The University's position is that the SAM was not promulgated pursuant to the Board's authority. The University points to testimony by Guyton, the University's internal auditor who reported to the Board of Regents. Guyton testified,

You have three levels of policies. You have the Board policies, which the Board of Regents develops, and then you have

the System policies, which is the system, the University of Houston system, that level. And then you have the campus. Each of the campuses are under the System. So that's the campus level policy.

The University contends, "Nowhere in this dialog does Guyton ever testify that the Board of Regents adopted the MAPP or the SAM, approved them, or had any authority over their creation in any way."

The University, however, ignores Guyton's testimony describing the Board of Regents's role over the rules in the SAM. The record shows,

[Attorney:] The Board has their own policies?

[Guyton:] Right.

[Attorney:] But pursuant to those policies, they are policies that are established for the University of Houston System as a whole, correct?

[Guyton:] That's correct.

[Attorney:] And there are also policies that, *pursuant to the Board's authority,* that are policies and rules that are issued for each component of the University of Houston System?

[Guyton:] That's correct.

(Emphasis added.) The record therefore supports Barth's position that the policies in the SAM are set forth under the authority of the Board of Regents for the University of Houston System as a whole. Thus, according to Guyton's testimony, a violation of the SAM would be sufficient to show a violation of the law under the Whistleblower Act because the SAM is an administrative rule set by the Board of Regents, which is considered a law under

the Act. *See* Tex. Gov't Code Ann. § 554.001(1); *Fazekas,* 565 S.W.2d at 304.

### 2. The MAPP

Barth contends that the MAPP was enacted under the Board of Regents' statutory authority. The record, however, has no evidence to support that assertion. Guyton testified as follows:

[Guyton:] At this time the Manual of Administrative Policies and Procedures. That's the University of Houston's Administrative Policy Manual.

[Attorney:] Those are—those are enacted pursuant to the authority of the Board of Regents?

[Guyton:] No, that's the campus policies.

A violation of the MAPP, therefore, is a violation of internal policy, which is not subject to the protections in the Act. *See Kallina,* 97 S.W.3d at 175 ("Neither was adopted by the Houston City Council. It is quite clear that these manuals (and the hundreds of pages they contain) reflect internal policies rather than rules promulgated pursuant to an ordinance."); *Ruiz v. City of San Antonio,* 966 S.W.2d 128, 130 n. 5 (Tex.App.-Austin 1998, no pet.) ("Nothing in the record indicates the Department promulgated its internal policies pursuant to statute or ordinance.").[1]

### B. Law Enforcement Authority in Whistleblower Act

Having determined that the SAM, regulations that govern state contracts, and the Texas Penal Code are the pertinent laws, the next determination is whether Barth reported the conduct was to an appropriate law enforcement authority. Barth contends he had a good faith belief that his report to Guyton and Harris satisfied the

---

1. The jury charge instructed the jury that "The University of Houston's rules are adopted under a statute." The jury was therefore instructed that all University rules and policies, which would include those rules and policies stated in the MAPP, were violations of the law under the Whistleblower Act. This is erroneous. I would therefore sustain the University's issue concerning the erroneous jury charge.

Act's requirement that the report be made to an appropriate law enforcement authority. The University, however, responds that none of the people to whom Barth reported meet the definition of law enforcement authority under the Act, and the report to the University Police Department came too late because it was after the retaliatory acts claimed by Barth. I address separately each of the people to whom Barth reported, Barth's claim of good faith, and the ultimate report to the University Police that came after the complained of retaliatory acts.

### 1. The Report to Guyton

Guyton, the internal auditor, would be an appropriate law enforcement authority if he were authorized (1) to regulate or enforce the law alleged to be violated in the report or (2) to investigate a violation of criminal law. *See* TEX. GOV'T CODE ANN. § 554.002. No evidence, however, shows that Guyton was an appropriate law enforcement authority under the Act because (1) Guyton could not regulate or enforce any civil law, including the SAM, and (2) Guyton could not investigate or prosecute a violation of criminal law. *See id.*

### a. Regulation or Enforcement of Civil Law

As discussed in more detail in the section regarding waiver of the appeal, Barth never asserts that Guyton, as the internal auditor, has the authority to regulate or enforce any civil law, which is the first alternative way to prove that someone is a law enforcement authority under the Act. *See id.* Barth limits his argument to the second alternative way to prove that someone is a law enforcement authority under the Act, which pertains to the person's authority to *investigate* a violation of *criminal* law. Although Barth attempts to misapply the second alternative by referencing the investigation of violations of civil law in addition to criminal law, the

second alternative plainly applies only to investigations of violations of *criminal* law. TEX. GOV'T CODE ANN. § 554.002 ("[A] report is made to an appropriate law enforcement authority if the authority ... is authorized to: (1) regulate under or enforce the law alleged to be violated in the report; or (2) investigate or prosecute a violation of criminal law"); *see Needham,* 82 S.W.3d at 317–18.

Assuming that Barth is attempting to assert that he could regulate or enforce a civil rule or regulation, a close examination of the Government Code does not support that position. Under section 2102.003, Guyton is authorized to conduct audits including an "investigation described by Section 321.0136." TEX. GOV'T CODE ANN. § 2102.003 (Vernon Supp.2007). Section 321.0136 defines "investigation" as *"an inquiry* into specified acts or allegations of impropriety, malfeasance, or nonfeasance in the obligation, expenditure, receipt, or use of state funds, or into specified financial transactions or practices that may involve such impropriety, malfeasance, or nonfeasance." TEX. GOV'T CODE ANN. § 321.0136 (Vernon 2005) (emphasis added). Guyton's duties, according to the Government Code, are to report directly to the state agency's governing board, to develop an annual audit plan, to conduct audits, to prepare audit reports, to conduct quality assurance reviews, and to conduct economy and efficiency audits. *See* TEX. GOV'T CODE ANN. § 2102.007 (Vernon Supp. 2007). Although the Government Code authorizes Guyton to *inquire* about financial impropriety or malfeasance, nothing in the Code gives Guyton the authority to "regulate under" or "enforce" the rules in the SAM or any civil state rule or regulation.

Guyton's trial testimony is consistent with the authority described in the Government Code. As Guyton testified, "Our Board of Regents policy on auditing has

full and free access to personnel, books records, and they've got to talk to us.... I can't fire anybody, or bring disciplinary action against them. All I can do is report that." Guyton thus acknowledges that he had no enforcement power. As Guyton's testimony and the Code make clear, Guyton is not a law enforcement authority under the first alternative in the Act because Guyton could not regulate or enforce the SAM or any civil rule or regulation. *See* TEX. GOV'T CODE ANN. § 554.002.[2]

**b. Investigation or Prosecution of Violation of Criminal Law**

Under the second alternative to prove that the report was to an appropriate law enforcement authority, the evidence must show that Guyton could investigate or prosecute a violation of criminal law. *See id.; Needham*, 82 S.W.3d at 319. *"[G]eneral* authority to regulate, enforce, investi-

gate or prosecute" is "not enough." *See Needham*, 82 S.W.3d at 319 (emphasis in original). Barth contends that the conduct concerning the false statements on the payment vouchers constituted the crime of "Tampering with Governmental Record," as described in section 37.10 of the Texas Penal Code. TEX. PENAL CODE ANN. § 37.10 (Vernon Supp.2007).

The Government Code gives Guyton the power to investigate and inquire into financial impropriety and malfeasance pursuant to his duties as an auditor, but it does not authorize him to conduct criminal investigations for purposes of prosecution. *See* TEX. GOV'T CODE ANN. §§ 321.0136, 2102.007. Guyton explains that he investigates suspected criminal activity "up to the point where we say there is a possibility" that fraudulent activity has occurred and then turns it over to the police.[3] In his

---

2. The University's internal audit revealed that Stutts's conduct violated the SAM section 03.-A.05, but Guyton's finding of a violation did not result in any enforcement, nor was it any type of regulation under the SAM; rather the audit only made recommendations. The audit report states,

> Recommendation: Absence of any written amendment to the contract, all Chartwells operating costs not initiated by Chartwells should be processed by HRM through standard university procurement protocol and allocated to the contract through agreements, which are processed and approved through the Contract Administration Department. The contract should be amended to require any transactions initiated or consummated by HRM be paid directly by HRM.
>
> Management's Response (HRM Management): HRM agrees with the recommendation and will fully comply. This action is completed.
>
> Management's Response (UH Management): UH management agrees to amend the contract to require any transactions initiated and consummated by HRM be paid by HRM and allocated to Chartwells, if appropriate. This action will be completed by July 31, 2007.

3. As support for his claim that "Guyton investigated violations of the Texas Penal Code and made his determination that there was no violation," Barth points to the Internal Audit Report by Guyton that set forth the results of his investigation. The report states,

> During our review, the HRM faculty member making the assertions [Barth] contacted the UH Police Department (UHPD) to allege possible violations of the penal code related to some of the items under review. We found no evidence of any HRM resources being misappropriated or used by HRM faculty or staff for any purpose other than the business purposes of the University. As a result, our interpretation of the provision of the penal code under § 37.10 is that there is no violation.

Although this portion of the audit report shows that the auditor determined no crime occurred, the report is no evidence that the auditor was authorized to conduct a criminal investigation for purposes for criminal prosecution, because if the auditor had found some evidence to suggest a crime had occurred, all the auditor could do with the information is tender it to the police for investigation.

testimony, Guyton describes his role as follows:

> When we find evidence of suspected criminal activity, we turn it over to the police and then assist them in their investigation. They're the ones who actually investigate the criminal activity.

Guyton's role in the investigation of impropriety or malfeasance is similar to that of the supervisor in *Kallina*, which was found to be legally insufficient. *See Kallina*, 97 S.W.3d at 173–74. As the *Kallina* court stated,

> Here, the reported violation concerned theft. There was no evidence Harris or anyone else in the City's asset management department had (or that Kallina believed they had) any authority to investigate, enforce, or prosecute a violation of the state's penal laws regarding property theft. At most, the evidence showed Harris had administrative responsibility for assets in the warehouse, regulated and enforced departmental rules for protecting that property, and *was required to investigate and report any criminal activity*. But Kallina conceded he knew Harris could only forward evidence of theft to the police for actual investigation and prosecution under state law. *Needham* holds this is not enough.

*Id.* (citing *Needham*, 82 S.W.3d at 321) (emphasis added). I would hold that although Guyton was required to investigate for improprieties and malfeasance, power to conduct an inquiry as an auditor does not, as a matter of law, show that he was authorized to "investigate a violation of criminal law" or prosecute criminal law because, upon any belief that a criminal law was violated, his role as the auditor was to turn the matter over to the police for a criminal investigation. *See* TEX. GOV'T CODE ANN. § 554.002. Guyton, thus,

is not an appropriate law enforcement authority as a matter of law.

### 2. The Report to Harris

To show he reported to a proper law enforcement authority, Barth relies on his report to Harris, the University's Senior Vice–President for Finance and Administration, the chief financial officer for the University, and the person to whom the University Police Department reported. But Harris was not an appropriate law enforcement authority under the Act.

#### a. Regulation or Enforcement of Civil Law

One way for Harris to be an appropriate law enforcement authority is for the evidence to show that he could "regulate under" or "enforce" civil regulations or the SAM. *See* TEX. GOV'T CODE ANN. § 554.002. No one claims, and no evidence shows, that Harris could regulate or enforce civil regulations concerning state contracts. The question, therefore, is whether Harris could regulate under or enforce the SAM, which are the rules that apply to the University of Houston system.

The only argument by Barth is the single sentence that states that Harris "had the authority to regulate and enforce [University] Rules with respect to financial matters and improprieties." The record shows that Harris had the authority to enforce "the University of Houston's rules regarding financial affairs." Nowhere in this testimony does it show whether Harris was referring to the rules in the MAPP or the SAM. If Harris was referring to the "rules" in the MAPP, his authority would not meet the requirements in the Act because the rules in the MAPP, as explained above, *are not* considered law under the Act. However, if Harris was referring to the "rules" in the SAM, his authority would meet the requirements in the Act because the rules in the SAM, as explained above, *are* considered law under the Act.

Because the evidence does not specify whether the "rules regarding financial affairs" are the type of rules that would be considered laws under the Act, the record fails to show any evidence that Harris could regulate or enforce any law.

### b. Investigation or Prosecution of Violation of Criminal Law

Barth contends that Harris's general oversight over the University Police Department is sufficient to show that he could investigate a violation of criminal law. The University's position is that the administrative responsibility for the police department did not give Harris any authority over the police investigative or prosecutorial actions.

The mere fact that Harris provided the general oversight for the police department does not give him the authority to investigate crimes. According to testimony by Frank Cempa, a former University police officer, "the police department was always autonomous in identifying criminal activity [and] present[ing] the findings to the Harris County District Attorney's Office." The record shows that when Barth reported his concerns about Stutts to Harris, Harris did not personally investigate whether there were any violations of criminal law; rather, he referred Barth's allegation to Guyton and his audit team. To the extent that Harris had the authority to refer concerns to the police or to Guyton, that power is similar to the investigatory power found legally insufficient in *Kallina* because Harris's role was limited to turning information over to the police for the

police to investigate. *See Kallina,* 97 S.W.3d at 173–74.[4]

### 3. The Requirement to Report Violation to University Police

Barth points to section 01.C.04 of the SAM, which provides that "employees shall report suspected criminal activity" to the appropriate campus police department; the University System Director, Risk Management or Component Risk Management liaison; the Director of Internal Auditing; the University General Counsel; or the Component Chief Financial Officer. Barth contends that this "System Rule on reporting suspected criminal activity provides that a report to Harris, Guyton, Duffy or the [University Police Department] triggers a report to all of them." However, nothing in the Act provides that the requirements are satisfied by a report to someone who is not an appropriate law enforcement authority, but is required to report the conduct to an appropriate law enforcement authority. *See Needham,* 82 S.W.3d at 321–22 (holding that Needham's "belief that [the Texas Department of Transportation] could forward information to another entity to prosecute a drunk driving allegation" was insufficient to show good faith by Needham).

The record shows that section 01.C.04 of the SAM, to which Barth points, plainly gives the police department the exclusive authority to conduct the investigation. Section 3.9 of the SAM states, "If the campus police department determines that the crime committed is against the university, the campus police department shall file charges." Further, section 3.4 allows

---

**4.** According to former Provost Ed Sheridan, both Harris and Dennis Duffy, the University's general counsel, had "the power to investigate potential violations of criminal law," so Sheridan reported Barth's concerns to Duffy and Harris. This power, however, is similar to the investigatory power found legally insuf-

ficient in *Kallina* because Harris's role was limited to turning over any information to the police who would then investigate it. *See City of Houston v. Kallina,* 97 S.W.3d 170, 173–74 (Tex.App.-Houston [14th Dist.] 2002, pet. denied).

the campus police to request assistance from the auditor "to assist in determining whether assets were misappropriated and to determine the extent or estimated amount of loss." These sections plainly show that the entity responsible for conducting the criminal investigation is the University Police Department, with others to assist it by providing information to the Department upon its request. I would hold that no evidence shows that Harris could investigate or prosecute a violation of criminal law. *See* Tex. Gov't Code Ann. § 554.002.

### C. Good Faith

The University contends that based on Barth's experience and training, Barth could not objectively have had a good faith belief that he was making a report to an appropriate law enforcement authority. An employee need only show a good faith belief. Tex. Gov't Code Ann. § 554.002(a). "Good faith" under the Act means (1) the employee believed the governmental entity was authorized to (a) regulate under or enforce the law alleged to be violated in the report, or (b) investigate or prosecute a violation of criminal law; and (2) the employee's belief was reasonable in light of the employee's training and experience. *City of Weatherford v. Catron,* 83 S.W.3d 261, 269 (Tex. App.-Fort Worth 2002, no pet.). "The test for good faith belief regarding an appropriate law enforcement authority consists of a subjective and objective prong, both of which must be satisfied in order to satisfy the good faith standard." *Tex. Dep't of Assistive and Rehabilitative Servs. v. Howard,* 182 S.W.3d 393, 402 (Tex.App.-Austin 2005, no pet.). Here, Barth's testimony established the subjective prong. However, no evidence meets the objective prong.

The objective prong requires that the employee's belief that the report was made to an appropriate law enforcement authority be reasonable in light of his training and experience. *Wichita County v. Hart,* 917 S.W.2d 779, 784 (Tex.1996). Consequently, those who are trained in law enforcement and investigation are held to a higher burden in establishing the reasonableness of their belief of criminal law violations. *Id.* at 785. For example, the reasonableness of a peace officer's belief that a law has been violated will be examined more closely than will the belief of one in another, non-law-enforcement profession. *Id.; Grabowski,* 922 S.W.2d at 956 (holding Grabowski did not meet second prong because his belief was not reasonable "in light of his experience as a peace officer" with "more experience than those in other professions in deciding whether an act is a violation of law").

Barth was a practicing attorney, a faculty member at the University, a member of the University Faculty Senate, and had experience with the requirements of the Act. I would hold that the evidence is legally insufficient to show that Barth's belief was objectively reasonable in light of his training and experience as an attorney who has familiarity with the requirements of the Act. *See Grabowski,* 922 S.W.2d at 956; *Hart,* 917 S.W.2d at 784. I would hold that Barth could not objectively have had a good faith belief that he was making a report to an appropriate law enforcement authority and, therefore, that the evidence is legally insufficient to establish a violation of the Act.

### D. Causation

Barth did ultimately report the purported violations to the University Police Department, but that report came too late because it did not occur until after the retaliatory acts of which he complains occurred. The University is correct that the report to the University Police did not occur until June 23, 2000, which is after

the complained of retaliatory acts, because the last retaliatory act occurred on May 8, 2000, when Barth received the evaluation for the 1999–2000 school year.[5] Because the report to the University police about Stutts's conduct did not occur until after the complained-of acts against Barth by Stutts occurred, the evidence is legally insufficient to meet the causation element of the Act. Further, the evidence is legally insufficient because no evidence establishes any of the challenged elements of the Act. More specifically and as explained above, no evidence shows that Barth made a report to an appropriate law enforcement authority or that he acted in good faith in making the report to a person he believed was an appropriate law enforcement authority.

## Conclusion

I would reverse the judgment of the trial court and render judgment in favor of the University.

---

**5.** Barth filed the second grievance on August 17, 2000, asserting that he received a lower ranking on the 1999–2000 performance evaluation that he received on May 8, 2000. The majority opinion holds that the retaliatory act did not occur until August 3, 2000, when Barth received a final copy of the evaluation. I would find that the retaliatory act occurred May 8, when Barth received the first copy of the evaluation. In his grievance, Barth complained of the grantsmanship rating he was given by Stutts. However, this rating did not change from the May 8 evaluation to the evaluation on August 3, which was the result of Barth's attempts to change the May 8 evaluation. Plainly stated, Barth's attempts to renegotiate the evaluation do not change the fact that the evaluation he complains of was received in May.